Filed 1/3/22  In re E.M. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re E. M. et al., Persons Coming Under the Juvenile Court Law. | B310996 (Los Angeles County Super. Ct. No. 20CCJP00026) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SARAH M.,<br><br>Defendant and Appellant. | |

APPEAL from the jurisdictional and dispositional orders of the Superior Court of Los Angeles County, Sabina A. Helton, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephanie Jo Reagan, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

After Sarah's (mother's) and Andrew's (father's) infant son, A.G., suffered a broken wrist and broken ribs, the juvenile court assumed jurisdiction over him and mother's three-year-old daughter, E.M. The juvenile court concluded that the broken bones were nonaccidental trauma. Father does not challenge the jurisdictional findings. Mother does as to the findings against her only, and also challenges the juvenile court's dispositional order insofar as it removed E.M. from her custody.

Mother's arguments ignore the standard of review on appeal, which requires this court to view the evidence in the light most favorable to the juvenile court's jurisdictional order. (*In re R.T.* (2017) 3 Cal.5th 622, 633.) Although mother describes this case as "a battle of the experts," she relies on expert testimony the juvenile court discredited. As mother acknowledges, "Two experts from [C]hildren's [H]ospital opined that . . . [A.G.] suffered the injuries while in the care of his parents and believed they were non-accidental." Once the proper standard of review is applied, the record supported the jurisdictional findings against mother.

Substantial evidence also supported the juvenile court's order removing E.M. from mother's custody. Mother failed to accept any responsibility for the physical abuse of A.G., and her lack of insight supported the juvenile court's removal of both A.G.

2

and E.M. from mother's custody.  Even if mother did not personally physically abuse A.G., there was substantial evidence supporting the finding that absent removal, mother either could not or would not protect A.G. or E.M. from abuse.

We affirm the juvenile court's jurisdictional and dispositional orders.

## BACKGROUND

Mother's two children are E.M. (born in September 2016) and A.G. (born in July 2019).  Father is A.G.'s presumed father and also has an older daughter, An.G., who was nine years old when the dependency proceedings commenced.  An.G. is not the subject of the current appeal.  E.M.'s biological father did not participate in the juvenile court proceedings and is not a party on appeal.

A.G. was born with hypoplastic left heart syndrome, a congenital condition affecting the development of the left side of his heart.  In October 2019, A.G. required a gastronomy tube for feeding, and the next month he required an oxygen tube to increase his oxygen levels.  These medical conditions, however, did not predispose A.G. to bone fractures.  At the time the dependency proceedings commenced, mother, father, A.G., E.M., and An.G., lived with maternal grandmother.  Mother worked during the day two or three days a week while father stayed home with the children.

1. *Dr. Karen Kay Imagawa's summary of A.G.'s medical records*

Dr. Karen Kay Imagawa, the director of the Audrey Hepburn CARES Center at Children's Hospital Los Angeles (CHLA), provided a summary of A.G.'s medical records, which

was admitted into evidence at the jurisdictional hearing over mother's objection. The CARES Center provides medical and mental health services for victims of child abuse. Dr. Imagawa described A.G.'s medical conditions from birth until his placement in foster care.

A.G. was in and out of hospitals from birth. We recount that history because the estimated dates of his injuries are significant to the expert testimony at issue here. From his birth in July 2019 through August 6, 2019, A.G. remained at Kaiser Permanente Medical Center (Kaiser). On August 6, 2019, Kaiser transferred A.G. to CHLA for a "higher level of care, to include cardiac surgery." From August 6, 2019 to August 20, 2019, A.G. remained at CHLA. From August 20, 2019 to August 23, 2019, A.G. was hospitalized at Kaiser. From August 23, 2019 through September 27, 2019, A.G. was in his parents' custody and attended several follow-up doctor visits. From September 27, 2019 to November 20, 2019, A.G. was hospitalized at CHLA. A.G. returned to the hospital in September 2019 because of his failure to thrive.

On October 10, 2019, an examination showed swelling in A.G.'s scalp, and the examination prompted further evaluation.[1] The next day, a skeletal survey showed that A.G.'s wrist was fractured. A.G.'s "parents denied any known trauma to explain [A.G.'s] healing right radius fracture." A.G. was discharged to his parents on November 20, 2019.

---

[1] It is undisputed that A.G. suffered the head injury while hospitalized and not while in mother or father's care. The juvenile court did not rely on the head injury when it assumed jurisdiction over A.G.

4

On December 16, 2019, A.G. was admitted to CHLA due to upper respiratory symptoms. A rib x-ray showed that he had healing rib fractures "at least 10-14 days old (predating hospital admission)."

On February 24, 2020, A.G. was discharged to foster care.

Dr. Imagawa concluded that the swelling on A.G.'s scalp "likely occurred while hospitalized." The wrist fracture "occurred during a period of time while [A.G.] was out of the hospital (i.e., 09/13/19-09/20/19)." The rib fractures also occurred while A.G. was out of the hospital. Dr. Imagawa explained: "Rib fractures are uncommon injuries in infants/children and have a high degree of specificity for non-accidental/inflicted trauma and are generally due to a significant compression of the chest from front to back . . . such as occurs when forcefully grasping and severely squeezing the chest. Lateral rib fractures (such as [A.G.'s]) may result from direct blows but are more usually caused by significant compression of the chest. Due to the flexibility/pliability of the rib cage in infants, significant force is required to fracture ribs."

Dr. Imagawa continued: "At this time the family has reported no known history of trauma to explain [A.G.'s] fractures, and despite [A.G.'s] complex cardiac condition, laboratory bone health and radiology studies do not reveal any significant underlying medical conditions that may predispose [A.G.] to fractures. Normal routine daily handling of an infant should not cause fractures, and, at this time non-accidental/inflicted trauma is the leading diagnosis . . . ."

## 2. *Petition and amended petition*

On January 3, 2020, the Los Angeles County Department of Children and Family Services (DCFS) filed a Welfare and

Institutions Code² section 300 petition. DCFS alleged that A.G. suffered fractures on his ribs and right wrist. "The injuries are consistent with inflicted trauma. Such injuries would not ordinarily occur except as the result of deliberate, unreasonable and neglectful acts by the child's mother and father . . . ." DCFS further alleged that the physical abuse of A.G. placed E.M. at risk of harm. DCFS repeated these allegations under subdivisions (a), (b)(1), (e), and (j) of section 300. Subdivision (e) applied only to A.G. and subdivision (j) applied only to E.M.

On February 27, 2020, DCFS filed a first amended petition. The amended petition added the allegation that DCFS might seek an order for no family reunification services.

### 3. Detention report

In advance of the detention hearing, a social worker interviewed father and mother. Father had no explanation for A.G.'s broken ribs. Mother reported that since A.G. was moved to CHLA, he was "discovered to have a broken wrist, a hematoma on his head and now four broken ribs." Mother believed the hospital staff was abusing or neglecting A.G. and requested he be transferred to a different hospital. Mother reported she was very careful with A.G. Mother said father took A.G. to the emergency room after A.G. vomited blood. Mother too had no explanation for A.G.'s injuries.

E.M. reported no concerns living with mother and father; she felt happy and loved in their home. When she was detained, E.M. started to cry and indicated that she wanted to stay with mother. Mother and father also cried when the children were

---

² Undesignated statutory citations are to the Welfare and Institutions Code.

removed from their care. A staff member at the Ronald McDonald House where mother and father were living was "shocked at the allegations."

### 4. *Jurisdiction report*

In advance of the jurisdictional hearing, DCFS reported a social worker interviewed An.G.'s mother, M.B., who reported that father abused her and An.G in the past. According to M.B., when An.G. was two and a half years old, father was "jerking" An.G, and broke An.G.'s right arm. M.B. described father as a "very violent person." According to M.B., father "would smack my daughter [An.G.] in the back of her head with his hands. He would hit her with the heel of his hands . . . . He did that whenever he did not agree with what she was doing. He used to punch me in the stomach, legs, and anywhere else that wasn't visible. He used to hit me, because he didn't like my friends or my coworkers." M.B. described father as "manipulative," emotionally abusive, and sexually abusive.

DCFS recommended no reunification services for father and mother.

### 5. *Jurisdictional hearing*

Three witnesses—two expert physicians and mother—testified at the jurisdictional hearing. Father did not testify.

#### a. **Dr. Phillip Stanley**

Dr. Stanley worked as a radiologist at CHLA and testified that he "see[s] all the children that [*sic*] come" into the hospital. Dr. Stanley had worked in pediatric radiology for 47 years. Dr. Stanley also worked as a radiology professor at USC. Over the course of his career, he had read images for over 900,000

7

children.  Dr. Stanley was a member of the CARES team for more than 30 years.  Dr. Stanley testified that the CARES team looks after children who had been abused.

According to Dr. Stanley, on October 11, 2019, A.G. "had a swelling on [his] head."  Dr. Stanley said it was difficult to date the injury, but it had probably occurred a few days earlier.

On the same day, Dr. Stanley noticed that A.G.'s right wrist was fractured.  Dr. Stanley opined that the fracture was "at least three weeks old," and that the fracture had occurred between September 13 and September 20, 2019.  Dr. Stanley testified that the fracture could not have been two weeks old because "there is too much healing for that."  Dr. Stanley opined that the fracture was due to nonaccidental trauma because A.G. was not mobile and could not have injured himself.  The injury could have been caused by "[g]rabbing the hand and bending it forward."  It also could have been caused by striking A.G.

Dr. Stanley rejected the theory that A.G.'s wrist was fractured when hospital staff at CHLA inserted intravenous treatment (an IV) in A.G.'s arm or wrist.  Dr. Stanley testified, "[W]e have a special IV team that sets up all the IVs.  You know, we've never had an example of them breaking a bone here.  I don't think this was due to that."  Dr. Stanley further testified the team who inserts the IVs is "very skilled and very gentle."  According to Dr. Stanley, the specialized team would not have broken A.G.'s wrist.  Dr. Stanley testified that if a broken bone had happened at another facility because of the insertion of an IV it would constitute "gross[ ] mishandl[ing]."

On December 23, 2019, A.G. returned to CHLA for a surgical follow-up and Dr. Stanley observed that three of A.G.'s ribs were healing from fractures.  Dr. Stanley indicated that a

8

fourth rib could have been fractured, but that conclusion was not clear from the x-ray. The rib fractures were "due to squeezing." The fractures were "specific for nonaccidental trauma." Dr. Stanley further opined that the fractures were between two and three weeks old (and occurred between December 9 and December 13, 2019). A.G. was in the care of his parents at that time. To break A.G.'s rib someone would have had to apply "very firm and deliberate" force.

Dr. Stanley stated that "a fair amount of force" was necessary to break a bone. He testified that A.G. had normal bones and was not predisposed to fractures. He further opined that the procedure to repair A.G.'s underdeveloped heart could not cause rib fractures.

### b. Dr. Thomas Grogan

Dr. Thomas Grogan, a pediatric orthopedic surgeon, testified on mother's behalf. Dr. Grogan had practiced almost 30 years and seen over 50,000 patients, including about 1,000 patients when they were under three months old.

With respect to A.G.'s wrist, Dr. Grogan testified A.G. "did not do it himself. It was something that was done to him." Dr. Grogan believed that someone bent A.G.'s wrist towards the palm causing the fracture to occur. He opined the fracture occurred two to three weeks before the October 11, 2019 image of the fracture. Dr. Grogan further opined that "it occurred shortly after his admission to the hospital on September 27, 2019." The "fracture pattern is suggestive of someone holding . . . the wrist in a fashion that frequently is done when we're looking to start an IV." When A.G. was admitted his "extremities had full range of motion without any limitation or pain" suggesting the injury occurred after A.G. had been admitted. Dr. Grogan testified that

"we're dealing with trainees a lot of times who are not the most skilled caregivers, and I think sometimes excessive force purely unintentionally could have been applied which I believe it was in this case."

On cross-examination, Dr. Grogan admitted that the medical records did not show that A.G. received an IV on September 27, 2019. Dr. Grogan conceded it would be "distinctly uncommon" to fracture an infant's wrist while inserting an IV. Dr. Grogan heard of an incident at one local hospital, but never heard of any such incidents at CHLA.

Dr. Grogan testified that three rib fractures most likely occurred 10 days to two weeks before December 23, 2019. The rib fractures were caused by "somebody squeezing the child perhaps even trying to lift [him] up under the arms and applying too much pressure . . . ." Rib fractures are "not uncommon in cases of abuse." Dr. Grogan believed that "someone simply applied too much force on that one occasion . . . ." Dr. Grogan opined that the rib fracture would have caused A.G. pain. According to Dr. Grogan, a person would have used about "the same amount of force required to crush a soda can" to break A.G.'s ribs.

Like Dr. Stanley, Dr. Grogan opined that the rib fracture occurred while A.G. was in mother and father's care. In contrast to Dr. Stanley, Dr. Grogan believed that the wrist fracture occurred while A.G. was hospitalized at CHLA. Dr. Grogan acknowledged that wrist and rib fractures are rare in infants.

### c. Mother

Mother testified that she was very careful with A.G. because of his heart condition. According to mother, the whole family treated him carefully. Father watched A.G. on the days mother worked.

10

Mother stated A.G. had biweekly visits at Kaiser where the doctor would bend A.G.'s arms and legs. A.G. never cried or screamed when the doctor bent his legs and arms. The doctor from Kaiser was concerned about A.G.'s weight and sent him to CHLA. Mother believed that CHLA gave him an IV because A.G. was malnourished at the time he was admitted to CHLA. Mother did not see anyone put an IV in A.G.'s arm.

Mother testified that a technician at CHLA who was taking an x-ray, dropped a plate on A.G.'s head. Mother was unhappy with A.G.'s care at CHLA and asked that he be transferred to Kaiser. Mother believed that medical staff at CHLA broke A.G.'s wrist and ribs.

Mother testified that she never hurt A.G. and she did not think father ever hurt A.G. Mother's position was that she and father "did nothing to harm" A.G. Mother also testified that she still lived with father.

Mother stated that she participated in a parenting program for 28 weeks. Mother further testified she participated in one individual therapy session; she also completed an anger management course. Mother received a certificate indicating that the anger management program lasted 10 weeks. Mother's visits with A.G. and E.M. were monitored, and the monitors reported no concerns.

### d. Counsel's arguments concerning jurisdiction and disposition

The parties argued extensively. As relevant on appeal, both mother's and father's counsel argued that neither parent was responsible for A.G.'s wrist injury or his broken ribs. Mother's counsel contended the court should not credit Dr. Stanley's opinions, and that if mother or father inflicted any

11

injury, "it was probably an accident." Father's counsel argued that the children would not be at risk if released to their parents' custody, emphasizing that mother and father were willing to care for A.G.'s special needs and made sure that he attended his scheduled medical appointments.

In contrast, counsel for E.M. and A.G. argued that the physical abuse of A.G. by mother and/or father posed a risk to both A.G. and E.M. and that both children should be removed from mother and father's custody. DCFS similarly argued that physical abuse by mother and/or father injured A.G. and placed both children at risk especially given mother and father's denial of any responsibility.

### e. The juvenile court's findings

The juvenile court sustained the petition, except it rejected DCFS's request for no reunification services. The court explained, "The parents have no explanation of how [A.G.] sustained his fractured wrist. I think that's undisputed. They offered through their expert Dr. Grogan that perhaps it was caused through an IV insertion. [¶] However, Dr. Stanley opined that based on his vast experience, the wrist fracture given the stage of healing happened before [A.G.'s] admission to the hospital. That would mean it happened while he was under the care of his parents. [¶] Dr. Stanley . . . is a member of the CHLA CARES team, and it is his specific job to opine whether a child's injuries happened as a result of abuse of not."

"Dr. Stanley also stated that CHLA has a specialized team of medical professionals who do IV insertion for children. In his over 40 years of experience, he's never seen a child suffer a broken wrist as the result of an IV insertion. [¶] Dr. Imagawa's letter supports this conclusion." "Dr. Grogan does not have

12

firsthand knowledge of the IV insertion procedure at CHLA . . . whereas Dr. Stanley who works there does have that experience."

"As to the rib fractures, the parents have no explanation how that injury may have occurred.  Both experts agreed it occurred as a result of compression to the chest.  Dr. Grogan stated it would take about the force of crushing a soda can.  Dr. Stanley also opined that it would take significant force likely caused by a squeezing injury.  [¶]  Dr. Imagawa stated rib fractures in babies are uncommon and are a good indicator of nonaccidental trauma."

The court continued, "I find it highly unlikely that a young baby would sustain [on] two separate occasions of broken bones at the hands of a hospital that gears itself specifically towards the treatment of children."

With respect to disposition, the court provided mother and father with reunification services.  The court indicated that mother and father took no responsibility and "it seems to be [a] complete denial in [an] effort to blame the hospital."  "I don't see that there is any insight by the parents at this time despite their limited participation in programs, and we are talking [about] two very young children who are extremely vulnerable."  The court removed A.G. and E.M. from mother and father's custody.

## DISCUSSION

### A.  We Exercise Our Discretion to Consider Whether Mother Was an Offending Parent

Mother does not challenge the juvenile court's assertion of jurisdiction over A.G. and E.M., and father did not appeal.  She does, however, challenge the jurisdictional findings against her and the dispositional order removing E.M from her custody.

We exercise our discretion to review jurisdictional findings against mother to the extent a reversal would mean the difference between mother being an " 'offending' " versus a " 'non-offending' " parent. (*In re Quentin H.* (2014) 230 Cal.App.4th 608, 613; see *ibid.* [choosing to consider one parent's challenge to jurisdiction even though the jurisdictional findings as to the other parent were uncontested because the outcome determined whether the appealing parent was offending].) As mother points out, the jurisdictional findings also supported the dispositional order removing E.M. from her custody.

Once we conclude, as we have below, that the jurisdictional order is supported under section 300, subdivision (b)(1), we decline to consider mother's further argument that the juvenile court erred in assuming jurisdiction under section 300, subdivisions (a), (e) and (j). Even if mother could demonstrate that one of several grounds for jurisdiction was unsupported, this court could offer no effective relief. (*In re Madison S.* (2017) 15 Cal.App.5th 308, 329.) Jurisdiction based on mother's conduct described in section 300, subdivision (b)(1) would exist regardless of this court's conclusions with respect to any other jurisdictional grounds. (*Madison S.*, at p. 329; see also *In re Ashley B. (*2011) 202 Cal.App.4th 968, 979 [juvenile court jurisdiction is appropriate if the evidence supports one jurisdictional finding].) Mother also fails to identify any harm derivative of multiple bases, as opposed to one basis for jurisdictional findings against mother. (*In re I.J.* (2013) 56 Cal.4th 766, 773 [when one basis for jurisdiction is supported, appellate court need not consider whether other alleged statutory grounds for jurisdiction are supported by substantial evidence]; *In re I.A.* (2011)

14

201 Cal.App.4th 1484, 1493 [declining to exercise discretion to review jurisdiction finding where the father "has not suggested a single specific legal or practical consequence from this finding, either within or outside the dependency proceedings"].)

## B. Substantial Evidence Supported the Jurisdictional Findings Against Mother

" 'In reviewing the jurisdictional findings . . . , we look to see if substantial evidence, contradicted or uncontradicted, supports them.  [Citation.]  In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citations.]" (*In re R.T.*, *supra*, 3 Cal.5th at p. 633.) "Substantial evidence indicates more than a smidgeon or trace; it must be meaningful and significant and cannot be merely speculative." (*In re Ma.V.* (2021) 64 Cal.App.5th 11, 22.)

The juvenile court did not err in making jurisdictional findings against mother based on section 300, subdivision (b)(1). Section 300, subdivision (b)(1) allows the juvenile court to assert jurisdiction upon a finding that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left . . . ."

Here, the evidence shows that mother failed adequately to protect A.G.  The evidence viewed in the light most favorable to the juvenile court's jurisdictional order demonstrates that while

15

A.G. was in mother and father's care, A.G. suffered on separate occasions a fractured wrist and three or four fractured ribs. The fractures were the result of inflicted trauma. Mother did not protect A.G. from these traumas. These injuries individually and cumulatively show that mother was unable to protect A.G. The juvenile court reasonably could infer that mother also was unable to protect E.M., whose youth made her particularly vulnerable, because mother took no steps to protect A.G. and did not acknowledge any responsibility for A.G.'s injuries. Mother just blamed the hospital. There was literally no expert testimony in support of mother's blaming the hospital, at least regarding the multiple rib fractures. Even Dr. Grogan dated those injuries as occurring while A.G. was in her parents' care and testified about force equivalent to crushing a soda can causing A.G.'s rib fractures.

Mother's contrary explanation ignores the standard of review. Mother argues that "mistakes do happen at hospitals—all the time . . . ." In her reply brief, mother argues that "the most likely explanation for [A.G.'s injuries] was the one Dr. Grogan identified." Mother emphasizes Dr. Grogan's testimony that A.G.'s wrist injury could have been caused by the insertion of an IV. Even if the evidence had shown that a staff member at CHLA inserted an IV into A.G.'s wrist, the juvenile court credited Dr. Stanley's testimony that the specialized team at CHLA would not have broken A.G.'s wrist.

In his 30-year career, Dr. Grogan was aware of one injury similar to A.G.'s broken wrist caused by the insertion of an IV, but the injury did not occur at CHLA. Dr. Grogan identified no support for his view that CHLA could have made a mistake in inserting an IV. Specifically, his hypothesis that a "trainee" may

16

have inserted an IV in A.G.'s arm, and testimony that "we're dealing with trainees . . . who are not the most skilled caregivers" was pure speculation. Dr. Grogan's testimony that A.G. could have been injured during the insertion of an IV was all the more speculative given that there was no evidence that anyone even inserted an IV in A.G. at the relevant time, when A.G.'s wrist was fractured. Indeed, mother testified that she was not aware that anyone inserted an IV, and she identified no hospital record showing that anyone at CHLA had inserted an IV in September 2019, when A.G.'s wrist was fractured.

In finding Dr. Stanley more credible, the juvenile court summarized its thought process: "Dr. Grogan does not have firsthand knowledge of the IV insertion procedure at CHLA or the IV insertion team at UCLA; whereas Dr. Stanley who works there does have that experience." We do not reweigh the juvenile court's credibility determinations. (*In re R.T.*, *supra*, 3 Cal.5th at p. 633.) We must affirm an order that is supported by substantial evidence even if other evidence, or other inferences from the evidence, would have supported a contrary finding. (*In re N.M.* (2011) 197 Cal.App.4th 159, 168.) Mother's focus on Dr. Grogan's testimony on appeal is thus to no avail given our standard of review.

Mother's argument that A.G. and E.M. were not at risk of harm at the time of the jurisdictional hearing also ignores our standard of review. Mother emphasizes the evidence in her favor rather than relying on the evidence in the light most favorable to the juvenile court's order. Although mother correctly points out that she participated in various classes, mother ignores the juvenile court's finding that those classes did not assist mother because she continued to deny the abuse and demonstrate a lack

17

of insight. The record unequivocally demonstrates that at the time of the jurisdictional hearing, mother blamed hospital staff for A.G.'s injuries. The juvenile court could thus reasonably conclude, as it did, that mother lacked the insight needed to protect A.G. and E.M.

Relying on her own testimony at the jurisdictional hearing, mother argues that she was a "highly concerned" parent and infers from that that she was a "non-abusive parent." Even if mother were the "non-abusive parent," she failed to protect her infant son from physical abuse so severe that it resulted in numerous fractures, and she failed to testify or otherwise show she would protect her young daughter. Mother's failure to protect A.G. placed both A.G. and his three-year-old half sister E.M. at risk of physical abuse supported the juvenile court's assumption of jurisdiction under section 300, subdivision (b)(1).

## C. Mother Demonstrates No Error in the Order Removing E.M. From Mother's Custody

Mother argues that the juvenile court erred when it removed E.M. from her custody. Mother argues that E.M. "was perfectly healthy and well cared for and showed no signs of abuse. [E.M.] denied any allegations of physical abuse and stated she loved Mother. [Citation.] [E.M.] was well bonded to Mother . . . ." Mother also emphasizes that she took classes prior to the jurisdictional hearing.[3]

To remove E.M. from her custodial parents, the juvenile court was required to find that removal was necessary by clear

---

[3] On appeal, mother does not suggest reasonable means other than removal to protect E.M.

18

and convincing evidence.  (§ 361, subd. (c).)[4]  We review the order to determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011; *In re Nathan E.* (2021) 61 Cal.App.5th 114, 123.)  We review the record in the light most favorable to the juvenile court's order and give deference to the juvenile court's credibility determinations.  (*Conservatorship of O.B.*, at pp. 1011–1012.)

Substantial evidence under this heightened standard of review supported the juvenile court's order removing E.M. from mother's custody.  The evidence shows that mother either abused A.G. or failed to protect A.G. from abuse.  Mother failed to take responsibility for the abuse that occurred while A.G. was in her custody.  Instead, she blamed the hospital for A.G.'s broken bones, notwithstanding the fact that according to Drs. Imagawa and Stanley, A.G. was not in the hospital when these injuries occurred.  Although mother took classes, she failed to gain any insight into the circumstances leading to jurisdiction and failed to show that she would protect E.M.[5]  Even if, as Dr. Grogan

---

[4] Section 361, subdivision (c)(1) provides in pertinent part that a dependent child shall not be taken from her parents' physical custody "unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's" custody.

[5] E.M.'s counsel argued that E.M. should not remain in mother's care.

suggested, "someone simply applied too much force on . . . one occasion," mother offered no evidence to support the conclusion that she would protect E.M. from the force sufficient to break A.G.'s bones.

The fact that mother continued to live with father, who, according to M.B., abused An.G. when An.G. was close in age to E.M. further supports the juvenile court's finding that E.M. was at risk of harm.[6] The juvenile court did not have to wait until E.M. suffered an injury to remove her from mother's care. (*In re R.V.* (2012) 208 Cal.App.4th 837, 849.) The "focus" is on "adverting harm to the child." (*In re D.B.* (2018) 26 Cal.App.5th 320, 328.) Substantial evidence supported the juvenile court's finding under clear and convincing evidence that E.M. was at substantial risk of harm if returned to mother's custody and there were no reasonable means to protect E.M. absent removal. (§ 361, subd. (c).)

---

[6] The juvenile court recognized that M.B. could potentially have been biased but nonetheless considered M.B.'s testimony in making its rulings: "Although I'm not relying on this entirely, there is the additional evidence of statements from [M.B.] detailing her own treatment by the father during their relationship, and the fact that [An.G.] also suffered similar injuries when she was two-and-a-half years old. I agree there is the possibility of motive or bias in these statements, but this evidence is also in the record."

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.

NOT TO BE PUBLISHED.


BENDIX, J.


We concur:



ROTHSCHILD, P. J.



CHANEY, J.